## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF WISCONSIN

| | |
|---|---|
| **DOHENY ENTERPRISES, INC.,** an Illinois corporation,          Plaintiff,<br><br>v.<br><br>**CLEARON CORPORATION**, a Delaware corporation,          Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)  No. _____<br>)<br>)  JURY TRIAL DEMANDED<br>)<br>)<br>) |

## COMPLAINT AND JURY DEMAND

### Nature of the Action

This is an action for violation of Section 2 of the Sherman Act. Defendant Clearon Corporation ("Clearon") has attempted to monopolize and restrain trade in the United States market for the sale on the Amazon Internet platform of chlorinated isocyanurates – often referred to as "chlorinated dry bleaches" or "CDBs" – which are used by consumers to clean swimming pools of bacteria and algae. Specifically, once Clearon obtained monopoly power in August 2020 over the market for the manufacturing of chlorinated dry bleaches not previously committed by contract, Clearon attempted to obtain monopoly power in a second market – the sale of chlorinated dry bleaches on the Amazon Internet platform – by eliminating from that second market Doheny Enterprises, Inc. ("Doheny"), which was a more efficient and lower-priced competitor. Clearon effectuated this attempt to monopolize by refusing to deal with Doheny.

Clearon first obtained monopoly power for the manufacturing of Trichloroisocyanuric Acid (Clearon product CDB 90®), often referred to as "Trichlor," and Sodium

Dichloroisocyanurate (Clearon product CDB 56®) often referred to as "Dichlor," because of the fire and destruction of a competitor's manufacturing plant.

As detailed below, Clearon then used its monopoly power in that market – the manufacturing market – to refuse to deal with Doheny. There was no efficiency justification for such refusal despite Clearon having dealt with Doheny for over ten years. Evidence that there is no efficiency justification for Clearon's refusal to deal is that executives at Clearon gave the clear impression to executives at Doheny that the purpose of such refusal to deal was to force Doheny out of the market for sales through Amazon. Forcing Doheny out of the market for sales through Amazon allowed Clearon to obtain monopoly power in this second market and to raise prices above the competitive levels that Doheny had been charging.

Clearon's refusal to deal with Doheny also violated the Wisconsin Fair Dealership Law, which prohibits a grantor of a right to sell a product from terminating a dealership agreement to resell that product without good cause.

The foregoing conduct has damaged Doheny Enterprises Inc. in an amount between $10 million to $15 million.

## The Parties

1.    Plaintiff Doheny is an Illinois corporation with its principal place of business in Pleasant Prairie, Wisconsin. Doheny purchased Trichlor and Dichlor from Clearon and resold it to consumers both directly through Doheny's own website and indirectly through the Amazon Internet platform.

2.    Defendant Clearon is a Delaware corporation with its principal place of business in South Charleston, West Virginia. Among other products, Clearon manufactures chlorinated isocyanurates, often referred to as chlorinated dry bleaches (CDBs), which it had sold to dealers

2

who, in turn, re-sold these chlorinated dry bleaches to consumers to clean swimming pools of bacteria and algae.

<u>**Jurisdiction and Venue**</u>

3.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1337(a). This action arises under the antitrust laws of the United States, specifically Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15, 26) for violations of Section 2 of the Sherman Act (15 U.S.C. § 2).

4.      This Court also has subject matter jurisdiction pursuant to 28 U.S.C. §1332(a) in that the matter in controversy exceeds the sum of $75,000 exclusive of interest and costs and is between citizens of different states. Doheny is incorporated in the State of Illinois and has its principal place of business in Wisconsin. Clearon is incorporated in the State of Delaware and has its principal place of business in West Virginia.

5.      Venue is proper pursuant to 15 U.S.C. §§ 15 and 22, and also pursuant to 28 U.S.C. § 1391(b)(2), (c)(2), and (d).  Clearon has shipped products into this district. Specifically, on information and belief, Clearon has shipped products to the Amazon fulfillment center located in this district.  (This information and belief is based on the fact that Clearon is selling on the Amazon Internet platform using Amazon's fulfillment centers and the fact that Amazon has a fulfillment center in this district). Moreover, the injury caused by Clearon's conduct substantially occurred in this district in that it was inflicted on Doheny, which has its principal place of business in Pleasant Prairie, Wisconsin, a community within this district.

6.      This Court has personal jurisdiction over Clearon pursuant to 15 U.S.C. § 22 because Clearon is a company that transacts business and maintains substantial contacts in this

3

district. Further, Clearon's conduct had the intended effect of causing injury to Doheny, which is headquartered in this district.

<strong><u>General Allegations</u></strong>

**Chlorinated Dry Bleaches**

7.      Consumers who own private swimming pools need to regularly sanitize their pools to remove bacteria and algae.

8.      Chlorinated isocyanurates – often referred to as chlorinated dry bleaches – are the most efficient and cost-effective way for consumers to clean pools of bacteria and algae.

9.      Trichloroisocyanuric Acid is a chlorinated dry bleach manufactured by Clearon. It is identified by Clearon as its product CDB 90® and it is often referred to as "Trichlor."

10.     Trichlor is a chlorine-based product used for long-term water maintenance.

11.     Trichlor generally is sold in tablet form in 1 inch or 3 inch sizes that look like hockey pucks.  It also is sold in a stick form.

12.     Trichlor tablets dissolve very slowly and are frequently drip-fed from automatic chlorinators, floating dispensers, or pool skimmers. Trichlor tablets in those devices can be "set and forgotten," and it is safe to swim in the pool at the same time that such tablets are dissolving into the pool water.

13.     There are not good substitutes for Trichlor tablets for long-term water maintenance.

14.     Consumers could substitute bromine, but bromine is almost twice as expensive as Trichlor. In addition, Trichlor acts as both an oxidizer and sanitizer, while bromine is only a sanitizer.

15.     Outside of bromine, the possible substitutes for Trichlor are even less attractive to consumers.  Consumers could technically use chlorinating liquid or bleach, but because these

4

dissolve so quickly compared to the tablets, consumers would have add such products to their pools every day or two unless the consumer uses a pool cover; then they could add such products to their pools twice per week.

16. The only other substitute for a consumer would be to use a saltwater chlorine generator (SWG) system. But consumers would be required to convert to a saltwater pool rather than freshwater. Such a conversion is very expensive and not a realistic option for a most consumers.

17. Although some consumers at the margins might substitute other products such as bromines for Trichlor in response to price increases for Trichlor, a sufficient number of consumers would not turn to such substitutes so as to make such price increases unprofitable.

18. Sodium Dichlorisocyanurate is another chlorinated dry bleach manufactured by Clearon. It is identified by Clearon as its product CDB 56® and it is often referred to as "Dichlor."

19. Dichlor is not used for long-term water maintenance. Instead, it is used for "shocking" a pool.

20. Shocking a pool means adding to the pool a great deal of chemicals at once in order to quickly destroy any algae or bacteria in the water.

21. Use of such large amounts of chemicals, however, generally requires that consumers have to wait a significant amount of time before consumers can swim again because of the chemicals in the pool.

22. Dichlor and other "shock" products usually come in granular form such as powder or crystals.

5

23.     Dichlor dissolves quickly and is milder than other chemicals used to shock a pool. Furthermore, Dichlor will not raise the pH level of a pool and will not cloud the pool water.

24.     A possible substitute for Dichlor as a chemical used for pool shock is Calcium Hypochlorite, often referred to as "Cal-Hypo."  Cal-Hypo is a strong chemical with a high pH level, along with significant amounts of calcium. Cal-Hypo will significantly raise the pH level of a pool.   Increased pH levels may result in skin irritation for swimmers and generally consumers must wait for the pH level to be reduced before swimming can begin again.

25.     Other possible substitutes for pool shock chemicals technically exist, but they are not as accepted by consumers as Dichlor.  One substitute is Potassium Monopersulfate (MPS). MPS is sometimes referred to as the "shock and swim" chemical because it is very mild and consumers can start swimming nearly 15 minutes after using it. MPS is a chlorine alternative oxygen-based shock.  Its primary drawback is that it does not destroy bacteria and algae as effectively as Dichlor and Cal-Hypo.

26.     Another possible substitute is sodium hypochlorite, also known as bleach or "liquid shock." Sodium hypochlorite is a commercial strength, heavy duty shock chemical most often used in commercial pools (and may be used in residential swimming pools). It dissolves very quickly and is typically delivered and stored in 50-gallon vats. It has an even stronger concentration of bleach than store-brand bleaches.

27.     Although some consumers at the margins might substitute other products such as Cal-Hypo, MPS, and sodium hypochlorite for Dichlor as a pool shock treatment in response to price increases for Dichlor, a sufficient number of consumers would not turn to such substitutes so as to make such price increases unprofitable.

6

**Manufacturers of Chlorinated Dry Bleaches**

28.    Prior to August 2020, there were three major manufacturers of chlorinated dry bleaches in the United States such as Trichlor and Dichlor – (1) Clearon, (2) BioLab, a unit of KIK Custom Products of Toronto, Canada, and (3) Occidental Chemical, a unit of Occidental Petroleum Corporation, headquartered in Dallas, Texas.

29.    In August 2020, the BioLab chlorine plant in Lake Charles, Louisiana was destroyed by fire following chlorine leaks caused by Hurricane Laura.

30.    The destruction of the BioLab plant has removed a major source of the production of chlorinated dry bleaches from the U.S. for at least all of 2021 and, perhaps, longer.

31.    On information and belief, the BioLab plant accounted for 40% percent of the chlorinated dry bleach production in the United States in 2019. (This information and belief is based on beliefs generally held in the industry).

32.    Prior to the destruction of the BioLab plant, offshore sources of chlorinated bleaches – such as from China – were not feasible supply substitutes because of transportation costs, antidumping tariffs, and countervailing duty tariffs, as well as certain other tariffs imposed on Chinese goods.

33.    After the destruction of the BioLab plant, supply from offshore plants could be justified in terms of the extra costs but supply was not available except at high prices.

34.    Upon information and belief, other chemical manufacturers which may have the technical capability to re-tool production and incur sunk costs to make chlorinated dry bleaches are not likely to do so because they most likely recognize that sometime in 2022, the BioLab plant at Lake Charles, Louisiana will be rebuilt and again produce chlorinated dry bleaches.  The sunk costs to retool would be lost. (This information and belief is based on the fact that other

chemical manufacturers have not publicly indicated that they are retooling to make chlorinated dry bleaches based on an Internet search).

35.     A substantial quantity of chlorinated dry bleaches manufactured in the U.S. and overseas are committed pursuant to long-term contracts and therefore are not available to respond to reduced output or increased prices.

36.     After the BioLab plant fire, Clearon had, and continues to have, monopoly power in the market for the manufacture of chlorinated dry bleaches not committed pursuant to long-term contracts.

37.     Historically, the two largest retailers of Clearon chlorinated dry bleaches for sanitizing consumer-owned swimming pools were Sam's West, Inc. (doing business as Sam's Club, a subsidiary of Walmart, Inc.), and Doheny Enterprises.

38.     Historically, Clearon's agreement with Doheny allowed Doheny to sell Clearon product online.

39.     Clearon sold chlorinated dry bleaches for consumers under the trade name "NAVA." Clearon also sold a generic form of chlorinated dry bleaches to Doheny that Doheny then re-sold under its own name.

**Doheny's Role as a Distributor of Chlorinated Dry Bleaches Manufactured by Clearon**

40.     Doheny Enterprises has served as a distributor and dealer for Clearon-manufactured chlorinated dry bleaches – including both the NAVA and Doheny brand names – for over ten years.

41.     Doheny has built a large distribution network dedicated to Clearon's products, including eight distribution centers around the United States.

8

42.     Doheny not only sold Clearon-manufactured chlorinated dry bleaches for swimming pool sanitation to its own customers through the Doheny website, but it also sold directly to consumers shopping on the Amazon Internet platform.

43.      Amazon is the largest online retail marketplace in the United States, accounting for almost half of all retail e-commerce in the country. Through its website http://www.amazon.com, it reaches customers in several different ways.

44.     First, Amazon operates as a retailer, selling goods directly to consumers. It accomplishes this through its large network of Amazon fulfillment centers, where the company can store, pack, and ship items ordered through the Amazon website.

45.     Second, Amazon allows third-party sellers to use its Internet platform to sell directly to consumers. If a third-party seller wishes to take advantage of the Amazon Internet platform in this manner, then it must (1) pay Amazon a $39.99 registration fee; (2) pay Amazon a commission on each item sold on the Amazon platform that generally ranges between 8% and 15%; and (3) pay Amazon either a monthly subscription fee of $39.99 per month or an additional fee of $0.99 per item sold.

46.     Third-party retailers can use their own distribution centers when selling through the Amazon Internet platform. If a third-party retailer chooses this option, then the third-party retailer is responsible for shipping and the costs associated with shipping.

47.     For an additional fee, however, third-party retailers can instead elect to use the "Fulfillment by Amazon" service. If a third-party retailer selects this option, then Amazon itself will store, pack, ship, and manage customer returns and service at the Amazon fulfillment centers.

9

48.     Amazon dominates the United States online retail market. It enjoys nearly half of all online sales of consumer goods, while the next nine largest online retailers – which consists of companies like eBay, Inc., Walmart Inc., and Costco Wholesale Corporation – **combine** to account for only 21% of sales. Amazon therefore wields considerable power to control online retail prices by setting a benchmark floor price that many other online retailers are pressed to follow.

49.     During the COVID-19 pandemic, Amazon has further become the preferred Internet platform for consumers.

50.     During the pandemic, Walmart tried to institute an online service with free delivery called Walmart+.  On information and belief, Walmart established Walmart+ to compete with Amazon Prime but Walmart has been able to enroll only 30 million subscribers as opposed to Amazon Prime's 120 million subscribers. (This information and belief is based on an article found on the Internet).

**Clearon's Attempts to Compete With Doheny On The Amazon Internet Platform**

51.     Doheny has been able to sell NAVA and Doheny brand chlorinated dry bleaches through Amazon at very competitive prices because Doheny has its own distribution centers and, therefore, does not have to use Amazon's fulfillment centers. For example, Doheny was able to sell ten pound buckets of Clearon-manufactured chlorinated dry bleaches for only $59.99 through the Amazon Internet platform as recently as June 2020.

52.     Prior to August 2020, Clearon tried to compete with Doheny by selling NAVA-brand products directly to consumers on the Amazon Internet platform.

53.     Prior to August 2020, Clearon was not successful at competing with Doheny on the Amazon Internet platform because Clearon did not itself have distribution centers. Consequently, it was forced to use Amazon's fulfillment centers.  As set forth above, Amazon's

price structure for third-party resellers using the Amazon fulfillment centers results in higher prices than the prices that can be charged by a third-party reseller on Amazon that has its own distribution centers, such as Doheny.

54.     Prior to August 2020, many consumers therefore chose to buy chlorinated dry bleach products from Doheny's storefront on the Amazon Internet platform rather than Clearon's. This was because chlorinated dry bleaches are often treated as a commodity, where the product with the lowest price will receive the most sales.

**Clearon Refuses to Deal with Doheny**

55.     The Amazon Internet platform was the only practical way for Clearon to obtain supra-competitive prices for its monopoly in the manufacture of chlorinated dry bleaches.

56.     Because Clearon had principally relied on Doheny and Sam's Club for over ten years to resell the chlorinated dry bleaches to retailers and consumers, Clearon had no sales personnel or infrastructure – such as distribution facilities – for it to sell NAVA-brand chlorinated dry bleaches itself except through the Amazon Internet platform using Amazon's fulfillment centers.

57.     Clearon, however, could not obtain supra-competitive prices on the Amazon Internet platform if it had to compete with Doheny.

58.     In order to obtain supra-competitive prices on the Amazon Internet platform, Clearon had to eliminate Doheny as a competitor on Amazon.  It first attempted to do this by requesting in early 2020 that Doheny raise its prices on the Amazon Internet platform, specifically by telling Doheny that the company was not charging enough. But Doheny refused to raise its prices.

59. Following the BioLab fire and destruction of the BioLab plant in August 2020, however, Clearon obtained monopoly power for the manufacture of chlorinated dry bleaches. On information and belief, after the destruction of the BioLab plant, Clearon had 50% of the U.S. market for pounds of manufactured chlorinated dry bleaches that were not previously committed pursuant to contract. (This information and belief is based on beliefs by persons in the industry, including Doheny). In addition, there are no other available supplies not previously committed to other purchasers and there are also barriers to entry.

60. After the BioLab fire, some offshore chlorinated dry bleaches were imported into the United States despite the tariffs and other barriers to entry. Such imports were at high prices. On information and belief, some distributors sold such imported chlorinated dry bleaches at a loss merely to maintain their presence in the market. (Such information and belief is based on Doheny's own experience in purchasing and selling chlorinated dry bleaches manufactured offshore and imported into the United States).

61. Clearon then abused that monopoly power by refusing to deal with Doheny – effectively eliminating Doheny as a competitor on the Amazon Internet platform.

62. In October 2020 Clearon made an offer to Doheny that reduced the available pounds of chlorinated dry bleaches that it would sell to Doheny from 5.85 million pounds per year to 1.6 million pounds per year.

63. Clearon's offer also significantly raised prices to Doheny. Clearon's offer for Trichlor, for example, increased from $1.39 per pound in 2020 to $2.63 per pound in 2021 – nearly a 100% increase.

64. Clearon's offer would also make deliveries of product to Doheny beginning in March of 2021. This was problematic because those first shipment dates are already halfway

through the January through May pool supplies selling season.  Furthermore, the bulk of the shipments were scheduled after the January through May pool supplies selling season.

65.    The offer made by Clearon to Doheny was so onerous that it was effectively a non-offer. Doheny tried to find substitute chlorinated dry bleaches to re-sell, but could not find such substitutes at competitive prices.

66.    By eliminating Doheny on the Amazon Internet platform, Clearon eliminated an efficient, low-cost alternative for consumers to purchase chlorinated dry bleaches for swimming pools and instead substituted itself as a high-priced inefficient distributor.

67.    As of January 2021, Clearon has raised prices for its chlorinated dry bleaches on the Amazon Internet platform.  For example, Clearon has offered ten pound buckets of Clearon-manufactured chlorinated dry bleaches on the Amazon Internet platform for $75. That is a 25% price increase over what Doheny was offering.

68.    Other suppliers have not entered the Amazon Internet platform market in response to Clearon's price increases.

69.    Sam's Club has not entered the Amazon Internet platform market.

70.    On information and belief, Sam's Club is not likely to enter the Amazon Internet platform market to sell Clearon chlorinated dry bleaches because Walmart -- the parent company of Sam's Club -- has been trying to create its own platform to compete against Amazon.  (This information and belief is based on beliefs generally held by persons in the industry as well as Internet articles).

71.    By eliminating Doheny, Clearon and Leslie's, Inc. comprised a duopoly on the Amazon Internet platform for the sale of chlorinated dry bleaches.

72.    Leslie's, Inc. raised its prices to meet Clearon's higher prices.

13

73.    Clearon had no plausible procompetitive justifications for its removal of Doheny as a distributor on the Amazon Internet platform and its substitution of itself.

74.    Clearon's conduct is forsaking short-term profits to eliminate Doheny and obtain a monopoly on the Amazon Internet platform. Because it faces a downward sloping demand curve, Clearon's increase in prices for chlorinated dry bleaches offered on the Amazon Internet platform will result in the loss of customers compared to the sales made through Doheny on the Amazon Internet platform, but, on information and belief, Clearon's profit margins will also be reduced for its own sales compared to its sales through Doheny because of Clearon's increased distribution costs. (Such information and belief is based on the belief that Clearon faces a downward sloping demand curve and that Doheny's distribution costs on Amazon are lower that Clearon's costs).

75.    The foregoing evidence establishes that Clearon gave up a more profitable cooperative arrangement with Doheny in favor of a less profitable exclusion strategy that would envision Clearon recouping its losses through Doheny's resultant inability to compete.

76.    Because of the monopoly power of the Amazon Internet platform, a sufficient number of consumers would not turn to other Internet platforms in response to a price increase on the Amazon Internet platform so as to make such price increases unprofitable.

**Clearon's Violation of the Wisconsin Fair Dealership Law**

77.    Doheny is a dealership under the Wisconsin Fair Dealership Law, Wis. Stat. §135.01 *et seq*., in that there have been written and oral agreements between Doheny and Clearon for a period of over ten years.  These agreements granted Doheny the right to sell and distribute NAVA-brand and Doheny-brand chlorinated dry bleaches and established a community of interest between Clearon and Doheny in the business of offering, selling, and distributing NAVA-brand and Doheny-brand chlorinated dry bleaches at retail.

78. Pursuant to the written and oral agreements between Clearon and Doheny by which Doheny would sell NAVA-brand and Doheny-brand chlorinated dry bleaches, Doheny had the sole obligation as between Doheny and Clearon (i) to maintain a website for such sales; (ii) to market and advertise Clearon-manufactured chlorinated dry bleaches to consumers; (iii) to maintain inventory in Doheny distribution centers sufficient to meet demand, particularly to meet the heavy demand during the pool selling season from January through May; (iv) to bear the risk of loss of the product due to fire or other damage; (v) to maintain a marketing and sales staff; (vi) to take orders from consumers; (vii) to bill and receive payment from retailers and consumers; and (viii) to bear the risk of loss of nonpayment.

79. During the over ten years that Doheny acted as Clearon's distributor and dealer, NAVA and Doheny brand chlorinated dry bleaches accounted for between 11 and 12 percent of the revenues received by Doheny and between 10 and 11 percent of the gross profits earned by Doheny.

80. During the over ten years that Doheny acted as Clearon's distributor and dealer for NAVA-brand and Doheny-brand chlorinated dry bleaches, Doheny invested between $5 million and $10 million in inventory of NAVA-brand and Doheny-brand products on an annual basis.

81. During the over ten years that Doheny acted as Clearon's distributor and dealer for NAVA-brand and Doheny-brand chlorinated dry bleaches, Doheny invested between $5 million and $10 million for distribution centers and other facilities to sell NAVA-brand and Doheny-brand products efficiently and at a lower cost.

82. During the over ten years that Doheny acted as Clearon's distributor and dealer for NAVA-brand and Doheny-brand chlorinated dry bleaches, Doheny employed an individual

whose primary function was to administer and facilitate sales of NAVA-brand and Doheny-brand chlorinated dry bleaches to retailers and consumers.

83.     During the over ten years that Doheny acted as Clearon's distributor and dealer for NAVA-brand and Doheny-brand chlorinated dry bleaches, Doheny spent between $6 million and $10 million for advertising and promotion of those chlorinated dry bleaches.

84.     After the August 2020 fire and destruction of the BioLab plant in Lake Charles, Louisiana, Clearon offered to Doheny on or about October 22, 2020 a written agreement to buy NAVA-brand and Doheny-brand chlorinated dry bleaches at such significantly reduced amounts and substantially increased prices that it was effectively a non-offer.

85.     Furthermore, the offer made by Clearon was for the initial delivery of chlorinated dry bleaches halfway through the January through May pool supplies buying season. The bulk of the delivery would come after the January through May pool supplied selling season.

86.     The offer made by Clearon to Doheny on or about October 22, 2020 was a substantial change in the competitive circumstances of Doheny as a distributor and dealer of chlorinated dry bleaches without good cause.

87.     On information and belief, at approximately the same time, Clearon offered Sam's Club significantly greater volume of product at substantially better pricing for chlorinated dry bleaches for sale in Sam's Club locations than Clearon had offered to Doheny, as well as delivery of product prior to the beginning of the pool supplies buying season. This is because Sam's Club was not a competitor to Clearon for the sale of chlorinated dry bleaches on the Amazon Internet platform. (This information and belief is based on industry knowledge).

88.     Subsequent to its onerous offer to Doheny in October 2020 (that was effectively a non-offer), Clearon withdrew its offer to sell to Doheny on any terms, stating that it would not sell any product to Doheny.

89.     There are no other sources for chlorinated dry bleaches available to Doheny in 2021 at competitive prices.

## The Relevant Market

90.     The relevant product markets are the markets for the manufacture of chlorinated dry bleaches in the United States and the markets for the sale of Trichlor and Dichlor sold to consumers on the Amazon Internet platform.

91.     The relevant geographic market is the United States.

## Anticompetitive Effect

92.     As a result of Clearon's conduct, prices to consumers on the Amazon Internet platform for chlorinated dry bleaches have increased significantly.

93.     As a result of Clearon's conduct, consumers have fewer choices of where to obtain chlorinated dry bleaches to sanitize and shock swimming pools.

94.     As a result of Clearon's conduct, a more efficient and lower-priced distributor of chlorinated dry bleaches previously available to consumers has been eliminated on the Amazon Internet platform.

## Barriers to Entry

95.     Barriers to entry exist in that the costs of transportation and tariffs prevent offshore manufacturers from selling into the U.S. market at competitive prices.

96.     Furthermore, current U.S. manufacturers of chemicals that could retool their production and incur sunk costs to make chlorinated dry bleaches are not likely to do so because

they would incur sunk costs that they would not be able to recover when the BioLab plant in Lake Charles, Louisiana is rebuilt and begins to manufacture chlorinated dry bleaches.

97.     Upon information and belief, such other current U.S. manufacturers of chemicals have not yet retooled their production and incurred sunk costs to make chlorinated dry bleaches in response to Clearon's price increases. (This information and belief is based on Internet searches for announcements that other manufacturers of chemicals are switching to the manufacture of chlorinated dry chemicals).

98.     No new "greenfield" plant to manufacture chlorinated dry bleaches has been built in the United States in recent decades. This is due to a variety of reasons, including but not limited to the difficulty of obtaining environmental regulatory approval for such construction.

**Clearon Has A Dangerous Probability Of Obtaining Monopoly Power For The Sale Of Chlorinated Dry Bleaches To Consumers On The Amazon Internet Platform**

99.     By eliminating Doheny as a reseller of chlorinated dry bleaches on the Amazon Internet platform, Clearon and another company, Leslie's, Inc., now have nearly all of the volume of chlorinated dry bleaches available on the Amazon Internet platform.

100.    Clearon has also substantially raised prices on NAVA-brand chlorinated dry bleaches on the Amazon Internet platform. For example, as of January 23, 2021, it was offering 10 pound buckets of NAVA-brand Trichlor tablets for $75. In contrast, Doheny was able to offer the same product for only $59.99 on the Amazon Internet platform as recently as June 2020.

101.    Leslie's, Inc. has met Clearon's higher prices.

102.    No new suppliers have entered the Amazon Internet platform to sell chlorinated dry bleaches in response to the price increases of Clearon and Leslie's, Inc..

**Interstate Commerce**

103.    Clearon's conduct to restrain trade and to monopolize the U.S. market for the manufacture and sale of chlorinated dry bleaches was in interstate commerce.

104.    As a result of Clearon's conduct, the price of Trichlor and Dichlor in interstate commerce is likely to be higher than it would have been but for Clearon's conduct.

**Causation and Damages**

105.    As a direct and proximate result of Clearon's conduct, Doheny has been injured.

106.    But for Clearon's conduct, Doheny would have been able to compete more effectively.

107.    Doheny has suffered damages because of Clearon's conduct.

**COUNT I**

**Attempted Monopolization Of Trichlor Sold On The Amazon Internet Platform
In Violation Of Section 2 Of The Sherman Act**

108.    Doheny repeats and realleges paragraphs 1 through  107 as though fully set forth herein.

109.    Clearon has a dangerous probability of achieving monopoly power in the U.S. market for the sale of Trichlor on the Amazon Internet platform.

110.    Clearon has a specific intent to achieve monopoly power in the U.S. market for the sale of Trichlor on the Amazon Internet platform.

111.    Clearon has engaged in anticompetitive acts in furtherance of its specific intent to acquire monopoly power, including but not limited to refusing to deal with Doheny and eliminating Doheny as a competitor for the sale of Trichlor on the Amazon Internet platform.

112.    By reason of Clearon's conduct, Doheny has been injured in its business in an amount which is presently undetermined.

113.   Unless the injunctive relief requested below is granted, irreparable injury will occur, and will continue to occur, to Doheny.

## COUNT II

### Attempted Monopolization Of Dichlor Sold On The Amazon Internet Platform In Violation Of Section 2 Of The Sherman Act

114.   Doheny repeats and realleges paragraphs 1 through 113 as though fully set forth herein.

115.   Clearon has a dangerous probability of achieving monopoly power in the U.S. market for sale of Dichlor on the Amazon Internet platform.

116.   Clearon has a specific intent to achieve monopoly power in the U.S. market for the sale of Dichlor on the Amazon Internet platform.

117.   Clearon has engaged in anticompetitive acts in furtherance of its specific intent to acquire monopoly power including but not limited to refusing to deal with Doheny and eliminating Doheny as a competitor for the sale of Dichlor on the Amazon Internet platform.

118.   By reason of Clearon's conduct, Doheny has been injured in its business in an amount which is presently undetermined.

119.   Unless the injunctive relief requested below is granted, irreparable injury will occur, and will continue to occur, to Doheny.

## COUNT III

### Violation of the Wisconsin Fair Dealership Law

120.   Doheny repeats and realleges paragraphs 1 through 119 as fully set forth herein.

121.   At all relevant times, Wisconsin had a law known as the Wisconsin Fair Dealership Law (WFDL) found at Wis. Stat. §135.01, *et seq.*

122. Doheny has been a dealership of Clearon's under the WFDL selling Clearon-manufactured chlorinated dry bleaches.

123. Without good cause, Clearon refused to deal with Doheny and substantially changed the competitive circumstances of the dealership agreement.

124. Doheny's business has been damaged in the amount of at least $10 million to $15 million by Clearon's violation of the WFDL.

### **Prayer for Relief**

Wherefore, Doheny prays:

(a) That the conduct of Clearon alleged above be adjudged and decreed to be unlawful restraints of trade and monopolization in violation of Section 2 of the Sherman Act;

(b) That Doheny recover threefold the damages to have been sustained by it;

(c) That Clearon be enjoined from continuing its unlawful restraint of trade and monopolization;

(d) That Doheny recover its cost of suit, including reasonable attorneys' fees, as provided by the antitrust laws;

(e) That the conduct of Clearon alleged above be adjudged and decreed to be a violation of the Wisconsin Fair Dealership Law;

(f) That Clearon be enjoined from refusing to deal with Doheny and terminating Doheny as a dealer and distributor without good cause;

(g) That Doheny recover its cost of suit, including reasonable attorneys' fees, as provided by the Wisconsin Fair Dealership Law; and

(h) That Doheny be granted such other, further, and different relief as the nature of the case may require or as the Court may deem just and proper.

Dated: April 6, 2021                          DOHENY ENTERPRISES, INC.


                                       By: */s/ Jeffery M. Cross*
                                             One of its attorneys

                                        Jeffery M. Cross (WIED #0547980)
                                        D. Richard Self
                                        FREEBORN & PETERS LLP
                                        311 S. Wacker Drive, Suite 3000
                                        Chicago, IL 60606
                                        (312) 360-6000
                                        jcross@freeborn.com
                                        rself@freeborn.com

                                        Steven Filipowski
                                        HARRISON & HELD LLP
                                        333 W. Wacker Drive, Suite 1700
                                        Chicago, IL 60606
                                        (312) 621-5222
                                        sfilipowski@harrisonheld.com

## DEMAND FOR JURY TRIAL

Doheny Enterprises, Inc., by its attorneys, hereby demand pursuant to Rule 38(b) of the

Federal Rules of Civil Procedure, trial by jury of all issues triable by right.

Dated: April 6, 2021                     DOHENY ENTERPRISES INC.


By: */s/ Jeffery M. Cross*___
         One of its attorneys

Jeffery M. Cross (WIED #0547980)
D. Richard Self
FREEBORN & PETERS LLP
311 S. Wacker Drive, Suite 3000
Chicago, IL 60606
(312) 360-6430
jcross@freeborn.com
rself@freeborn.com